This time we'll hear Connecticut Ironworkers versus New England Regional Council. Good morning, Your Honor. May it please the court, my name is Paul Hederman. I'm appearing on behalf of the plaintiff's appellants. In addition to the procedural issues before the court arising out of the defendant's motion for summary judgment and its brief before this court, there are three substantive issues. The first is whether the defendant has proven, as a matter of law, that each element of the construction industry proviso. The second is what are the elements or factors of the non-statutory labor exemption. And the third is whether the defendant has proven, as a matter of law, each and every element of the non-statutory labor exemption. With respect to the construction industry proviso, the contested elements before the trial court were whether or not the defendant had entered into agreements with construction managers who could be considered employers in the construction industry, whether those agreements arose out of a collective bargaining relationship, and whether Congress, back in 1959, considered those types of agreements to be lawful within the construction industry. Labor law has established... Perhaps you can help me a bit to understand this. We have two types of agreements before us, right? One is the collective bargaining agreement, which we're very familiar with, and a project labor agreement. What exactly is a project labor agreement? A project labor agreement, Your Honor, relates to a specific construction project, whether you're putting up a building, building a bridge, building a tunnel. Basically, the owner of the project gets together with contractors and the unions to establish a project labor agreement, which sets forth the rules for that particular project. The goal of the owner is to make sure that all the unions and contractors are on board and that there will be no work stoppages. If there are any disputes pertaining to the work done at the project, it will all be resolved by the means set forth in the project labor agreement. In return, the contractors and unions agree that they will be bound by the terms of the project labor agreement. But is this a suggestion that the project labor agreement supersedes the collective bargaining agreement? It's not a suggestion, Your Honor. It does. It does? Yes. Now, obviously, it's a contract, but the whole purpose of the project labor agreement is to make sure that none of the individual unions can rely upon their collective bargaining agreement with respect to any topic or subject matter that's covered by the PLA. Subcontracting, which is what we're talking about here today, is covered by the PLA. And if you look at a variety of PLAs, you'll see that they all say that the construction managers are entitled to subcontract the work to any qualified contractor, and that contractor does not have to be associated with any particular union. The problem we have here is that the carpenters are attempting to require the construction managers on projects governed by PLA, on projects governed by public bid laws, and projects that might be governed by neither to agree in advance that certain types of work has to go to the carpenters. And the danger is, is that since the carpenters are no longer a party to the AFL-CIO, is that they, every time their contract comes up, they attempt to expand their scope of work and infringe upon work that traditionally has been performed by other unions. And if the carpenters want to compete with respect to that work, there's no problem. But the downside is, is that when they have these agreements with construction managers, who are basically just subcontracting out the work, is that they're not competing for it. It used to be, is that the CEM would take bids from multiple unions and contractors, iron workers, sheet metal workers, whomever, accept the best bid. That contractor got the bid, and then that contractor would be governed by its own CBA. What the carpenters are doing is that they're jumping ahead a step. They're saying, we no longer want that competition between the iron workers, et cetera. We want you to guarantee that that work has to go to the carpenters. And that eliminates all competition, what we refer to as inter-brand competition between different trades. Senator, is this a traditional recognized craft back to 1959, sheet metal workers and metal panel workers? The iron workers, sheet metals, and glazers, yes, sir, and the carpenters, of course. Is that these trades have been around for many, many years. These trades have been around and distinct? Actually, Your Honor, back then, the work was much more defined back then. So when you said you had an iron worker, everybody knew what the iron worker did. Everybody knew what the sheet metal did, a carpenter, et cetera. What's changed in the construction industry over the years is that now those lines have been blurred. And now you have different unions all doing the same work. So, for example, when you talk about the curtain wall work, it's part of the work in this case. Which is almost always metal. Right. Well, now you have iron workers claim it, you have sheet metal workers claim it, you have glazers claim it, and you now have the carpenters claim it. They're like the most recent person to the party here. So if you looked at the old rules, when the construction manager says, okay, I've got some curtain wall work that I want done here, and I want to contract this out, you'd have contractors from each of those trades submit their bids. The CM would pick them, and then whichever contractor got the work would use his particular affiliated union. Now the carpenters are jumping ahead and saying, nope, we're going to skip all that. If we claim the work, which is set forth in our collective bargaining agreement, or whatever agreement they have with that particular CM, that CM can no longer consider giving the work to anyone else. The CM has to give the work to the carpenters. And that's the problem that we have here. Back in the old days, it wasn't so much of a problem because carpenters did their work. They didn't take anybody else's work. And if they did, they'd resolve it within the AFL-CIO. Now it's no longer available. If all of these separate crafts and trades have been blurred, then why do you characterize the initiative by the carpenters as work expansion rather than work preservation? Well, their expansion, Your Honor, is, for example, curtain wall. They never did curtain wall until, let's say, 15 years ago. So what they do is, is every time they renegotiate an agreement, they want to add work to it. And as we indicated, I don't know if it was covered in our briefing in this court, but in the motion, our response below, there was a situation in Rhode Island where they went in and they wanted to negotiate to expand their scope of work under Rhode Island CBA. And the contractors in Rhode Island said, no, we're not going to do that. You see, you use the verb to expand, and that sort of presumes the conclusion. And my question is, if these trades, once distinct and separate and identifiable, have become merged or ambiguous with everybody doing everything, how can you characterize these provisions of the project labor agreement as expanding the scope of what the carpenters would do, rather than simply preserving stuff that the carpenters' union does? Because, as you seem to concede, the carpenters' union now includes people who do sheet metal work and so on. It only does because they've changed the terms of their agreement. And the other trades aren't doing that. The other trades are pretty much sticking with what they've done. The carpenters, though, are saying, okay, we're going to get out of carpentry work. And, for example, they say, we're now going to go and do electrical work. So the carpenters have an electrical local in St. Louis, Missouri. Well, obviously carpenters never used to do electrical work. So this isn't simply they're saying, well, we're modifying it. They're going out and acquiring work. And, again, the key issue, Your Honor, is not that they're competing for the work. That's fine. But given the nature of these agreements, the problem is that they're guillotined to get the work. It's okay for them to poach on the work but not to contract to acquire, that they do it and not sheet metal workers or iron workers. It's okay for them to compete for it. It's not okay for them to get guaranteed contracts for it. That's the problem. Let's assume that your analysis of what the carpenters are doing, let's assume for a moment that that's accurate. The construction industry proviso is nevertheless, as I read it, broad. And why doesn't it contemplate that sort of arrangement? It talks about nothing in this subsection shall apply to an agreement between a labor organization and an employer. Well, the problem with that, Your Honor, is that the proviso is based upon the assumption that the agreement arises, the agreement is between the labor organization and an employer and that it arises out of collective bargaining relationship. These construction managers do not employ any trade members or union members on the job site. That's different than what it was back in 1959. Describe that for us. It might be helpful for us to understand the relationship between the two agreements. The project manager, what is the agreement and why don't you just describe the formation of that agreement as a prelude to this competition that you described? I'm sorry, are we talking about the project labor agreement, Your Honor? Project labor agreement. So basically with the project labor agreement, that's specific to a particular project and it only pertains to that project. And tell us what exactly goes on here. So there's a project to build an office building. Right. Who's doing what? Well, you have the owner, let's assume, who wants to put up the building or a state or the federal government wants to put up a building. Right. So basically they say, okay, let's do this by a project labor agreement because there's a lot of benefits to doing that. And who's agreeing to what? So the project labor agreement is drafted and ultimately all the people who want to work on the project. Who's drafting it? Generally it would be by the construction manager or by the owner with input from anticipated parties to the agreement. And who are the other parties to this agreement? You would have your construction manager, perhaps your owner. You would have the contractors who want to work on the job and you have the union that wants to work on the job. But that's even before you get to the point of selecting the various competing unions. Yes, Your Honor. So everybody signs off on this agreement and is bound by it. Including those at the next level, at the next stage? That is, are all of the different contractors and their respective unions, are they all in on the project agreement? Yes, Your Honor. Generally the project labor agreement will say that there can be no contractor, there can be no union that can work on this project unless they agree to be bound by the project labor agreement. So they actually have to sign off. So that's the predicate to everything else? As far as the PLA is concerned, yes, Your Honor. Yeah. And at that point you move to the second stage, shall we say, of these proceedings. The project manager chooses from among the eligible competing contractors? Right. So the CM used to say, I'll take bids from all these different contractors. Now the carpenters are trying to jump in and say, nope, you can't do that. If we claim the work, all that work has to go to us. You can't even consider bids from our contractors. The project agreement contemplates, let us say, four different contractors. Each of those contractors deals with a particular union. So in effect the contractor and the union are symbiotes, right? Yes, Your Honor. And each of them has a collective bargaining agreement. Yes, Your Honor. So your position is, why should the collective bargaining agreement of any one of those four supplant the arrangement, which is the predicate to all of these? The PLA says that those collective bargaining agreements do not control. That's the whole idea. And are those unions, in effect, already parties to the PLA? Yeah, if they don't agree, they can't work. That's how it works. And so you can have 20 different unions doing work on the project, and you can't have each of them saying, nope, we're going to have this fight over this and this and this. And so the project labor agreement says, no, all of those things, you sign up by this agreement, you agree to be bound by the disagreement, the resolution agreement that's set forth in the PLA. Otherwise what you would have is each of those 20 unions has a CBA that has its own dispute resolution procedure, and the owner or CM are going, I've got to deal with 20 different people on this. We're not going to do that. By definition, the arrangement you're describing would give the whip hand in these labor matters to the employer, to the manager, to the developer of the project at the expense of the various unions, right? I'm not quite sure. The unions all benefit. I mean, the idea is that it's all going to be union work, so they're going to go along with that. And the construction manager, the theory is, is that the construction manager is simply trying to find the best responsible bid at the lowest price, and that's who he's going to give it to. But if you're telling them, nope, you have to give it to the carpenters, well, that creates a lot of problems. And that's why we're objecting to that type of process. And there's no secret here. I mean, even the defendants in their original motion said that their collective bargaining agreement does not apply to projects governed by a project labor agreement, nor does it apply to projects governed by public bid laws. I'm getting a bit confused. I'm sorry, Your Honor. No, that's my fault here. But how can a project labor agreement allow a construction manager to select a particular plumbing contractor if that plumbing contractor has a CBA with the Brotherhood of Plumbers, for example? Mm-hmm. And does that mean then that when you select that particular contractor, you were going to get the Brotherhood of Plumbers doing that work? Yes. So when the contractor submits the bids, they're affiliated with the union. Presumably every contractor is affiliated with the union, and PLA is going to be done by somebody who's not in the union, right? Correct, Your Honor. So when you pick a contractor based on a low bid or what other considerations may govern, you're going to get employees of that contractor who are members of a particular union. Correct. If one specifies that everybody doing plumbing has to be a member of the Brotherhood of Plumbers, that's going to restrict the number of contractors who can bid, is that correct? Right, but it doesn't say that. What it says is that the CM, for example, can choose any contractor that's qualified, okay? That's all he has to do. So he can consider a contractor that's signatory to any union who's qualified to do the work. So, for example, let's take the work here. We've got four unions who claim to be qualified. The CM could take any of those. In theory, they are all qualified. Yes, Your Honor. That's the assumption. Right. And so the CM can take any of them. He can take the iron or the sheet or the carpenter, okay? And what the carpenters are doing is saying, nope, we're going to eliminate that. And we're going to say that the CM has to give it to the carpenters. I'm sorry. And that's the problem. Meaning it has to contract with a contractor or subcontractor whose sheet metal work is done by members of the carpenters' union. Is that correct? Well, the work in question is – I have a chicken and egg problem here because I don't know whether the CM is picking a union first or is picking a contractor first. He picks the contractor. The contractor makes the bid based upon the understanding or CBA arrangement with his union is what the price will be. If he picks a contractor who has a CBA with the sheet metal workers, then I don't understand how that can happen if the kind of agreement that you're objecting to is in place because you think the CM would then have to choose a contractor whose sheet metal work is done by members of the carpenters' union. Well, Your Honor, we have not reached the point yet where the carpenters own everything. And so there is work now that even the carpenters are not claiming. And so that work, the carpenter contractors don't bid it. So roofing work, for example, electrical work in some areas, for example, the carpenters don't bid that. So that's definitely going to go to a non-carpenter contractor. That's entirely a different point. That's entirely a different point. This is a chicken and egg problem. If you pick a contractor who does sheet metal work and that contractor has a CBA with the sheet metal workers' union, then I can't understand how that can happen if the kind of clause that you're talking about is in place. They would have to choose a contractor whose sheet metal work is done by members of the carpenters' union. Am I correct? Yes, Your Honor. The agreements that we have, the PLA says one thing, okay? The side agreements that we're talking about say something else, and that's the problem. We have no objection to the PLAs and the way that the PLAs are written and generally enforced. Our problem has to do with the side agreement where the carpenters say, look, regardless of what the PLA says, this work's got to go to the carpenters. That's the problem. I'm putting the whole thing together as one ball of wax. If I'm a construction manager and the PLA and the side agreements are all in place that we're talking about, I cannot get a contractor to do sheet metal work unless that contractor has a CBA with the carpenters' union. Am I correct? Yes, according to the side agreement, Your Honor. I'm assuming it. Right. I'm assuming it. That he has to go to the carpenters. He has to get a contractor who is a signature of the contractors or in some cases. He has to go to the carpenters. I don't understand that. He has to go to a contractor who uses, that has a CBA with the carpenters' union. Yes, that's right, Your Honor. And just so we're clear on this is that as a matter of labor law, a contractor cannot employ union members unless he's signatory to that particular union. Let's say the choice goes to a contractor who has got an agreement with the sheet metal workers, but they can also do carpentry work. So, Your Honor, the contractor has a CBA or agreement with two different unions. Yes. Yes, sir. All right, so the lowest bid is from the sheet metal workers who are also able to do carpentry work. Yes, sir. How do the carpenters get in the door under that circumstance? Well, excuse me, in that case, they have a contractual right. They'll claim to do the work. So the employer or the contractor who's done that has created a big problem for himself because he's entered into an agreement with two different unions, which may require him to give the same work to each of them, which sometimes happens. And what happens in those cases, one union does the work, and the employer has to pay the other union to some extent for the time they didn't get. That's the problem you run into. So you see many contractors now don't do that anymore. It used to be in the old days, so to speak, when each union was well-defined and there wasn't any overlap, it was not a problem. But now if a contractor signs to more than one union, that contractor runs the risk that he may be obligated himself to give a particular type of work to two unions, which is going to cost him a lot of money. In your description of the evolution of the construction business, I think you were suggesting two different developments. One was the fact that each of these trades now purport to be able to do other work, and that's perhaps something that's happened, what, the last generation or so? Yes, Your Honor. And secondly, you adverted to the carpenters' withdrawal from the AFL-CIO. Now, am I to understand that that's one of the consequences of withdrawal from the AFL-CIO, that they remove themselves from a decision-making, an adjudicative process created by the AFL-CIO for dealing with conflicts like this? Yes, Your Honor. What is that? The AFL-CIO has some sort of, as part of the national or international agreement, deals with these jurisdictional disputes as a matter of internal, some internal procedure, right? Yes, Your Honor. The AFL-CIO has the Constitution, to which all the member unions are a party. And when you have these conflicts, there's some way of mediating or adjudicating, arbitrating these disputes. And the carpenters withdrew from the AFL-CIO, and therefore they're not, if they had not withdrawn, this is perhaps not a matter of consequence in this case, if they had not withdrawn, would this case have ever been before a federal judiciary? I don't think so. I think they would have resolved it. Now, if the losing party, shall we say, didn't comply, there might be an objection. But otherwise, as far as I know, you do not have similar disputes among members who are a part of the AFL-CIO. And this is pretty widespread now around the country, the continuing warfare between the carpenters and others. Is that right? Yes, Your Honor. So this is not unique, or it may be unique to the Second Circuit at this point, or at least the first big case on this, but this is coming up all over the country. Yes, sir. Thank you. Thank you. Good morning. Good morning, Your Honors. May it please the Court. Keith Carroll for the appellee, New England Regional Council of Carpenters. Let's start where you ended off. The predecessor to this litigation was a series of jurisdictional arbitrations that had taken place in Connecticut over the scope of work for building panels. And in every single one of those, the decision came down that the carpenters, one, properly claimed the work, two were entitled to do the work and could go forward on a specific project and do the work. What we're talking about here in this case is every single agreement that is the subject of this litigation is a product of a valid exercise of lawful collective bargaining. It's established, and you go down the list. There are seven collective bargaining agreements that are in place between the carpenters union and general contractors in this case. And the record demonstrates, as the district court found, as a matter of law, each of these subcontracting clauses was entered into as part of a valid exercise of collective bargaining arrangement. But your adversary told us a minute ago that the PLAs superseded the CBAs. Right. Well, again, my adversary has said a lot in this case and in his papers. Well, let's just focus on that. Okay. So we can talk about? For the moment. Okay. So the answer to that question is no, the PLA does not supersede a collective bargaining agreement. In fact, the two specific PLAs that were discussed at the district court level looked at the language of the PLA. And in both instances, the inference was that, well, in one of them, the collective bargaining agreements were incorporated into the project labor agreement. And there are three project labor agreement cases that are part of the seven that they identified. The first one was St. Francis Hospital. There was a PLA in place in that case. The work on that case was done by, excuse me for a moment, it was not done by the carpenters. I can tell you, I'm sorry, it was done by the glaziers and the iron workers. The second PLA at issue in this case was 360 State Street. Turner was the general contractor. The work done on that case was done by the glaziers and the iron workers. The third PLA at issue in this case was the Bay State Medical Center case, and that's the one where they talk about this MOU, this memorandum of understanding, which they say was inconsistent with the project labor agreement that was in place on that case. The project labor agreement in that case said that the general contractor, or Barry, was required to select any qualified contractor under the agreement. Barry, at that time, was a signatory to the carpenters' union. In the carpenters' union, there was, and that was, there's no dispute at any point in this case that that collective bargaining arrangement between Barry and the carpenters' union was anything but a legitimate collective bargaining process. And it's exempted from the cargo provisions under the WOLKI and the Construction Industry Proviso, and the non-statutory labor exemption applies because it was clear that there was something that was in the scope of collective bargaining. Moreover, one of the other arguments they make with regard to that PLA. That means that no one else could have been considered under the PLA in that instance? And that's what Sunland says. That's what Local 210 says. That if it is within the construct of the proviso and it is part of the non-statutory labor exemption, absolutely. That it is immune from antitrust scrutiny. But what happened. No, I'm not asking whether it's immune from antitrust scrutiny. I'm asking whether in the execution of the PLA, does it foreclose any other union or any other contractor from consideration by virtue of the existence of the CBA in a particular instance? If the general contractor is signatory to the carpenters and it's a valid collective bargaining process and there is work claimed by the carpenters, then the carpenters have the right to enforce the subcontracting clause. What happened in effect on Berry actually was Berry selected Tower Glass as the subcontractor for this exterior panel. Tower Glass was signatory to the carpenters, signatory to the iron workers, and signatory to the glaciers. Or it might have been the sheet metal workers and the glaciers. They in turn subcontracted a smaller subset of that work down to MRS. MRS at that time had formally been a member of the carpenters union. But by that point, because they had been involved in some litigation with the sheet metal workers union, had abrogated their agreement with the carpenters. And so they were strictly a sheet metal worker shop. When it came time for them to do the work, they still got the work, but the requirement was that they ended up doing the work with a composite crew. So you actually had carpenters and sheet metal workers doing that specific work for MRS. At the Tower level, you had a composite crew of the three trades doing the work. And this was all enforcement of a valid subcontracting clause, a provision, that was in a valid collective bargaining agreement. Getting back to one of the questions that your honors had asked earlier about the scope of the technology and why you have overlapping competing jurisdictions. If you think about the way that buildings are constructed in the old days, you would start with the steel and you'd start from the inside and work your way out. Well now with the advances in technology, you have a building panel and everything comes prefab and premade. And you're literally taking a premade square of a building exterior and attaching a plumb level and square into the framework. Well, plumb level square has something that the carpenters have done since they formed as a union. So this isn't any expansion beyond the scope of work that they do. What has happened here is that building technology has advanced to the point where you have overlap between the unions. But that doesn't mean that the arrangement that's in place is in violation of the existing labor laws, or the construction industry proviso, or the non-statutory labor exemption. I also want to reference one of the arguments that has been made. This is not a case where the general contractors, or the construction manager in this case, were not employers within the construction industry, and therefore recalls outside of the privilege. And there were two specific cases that talked about this. There was the Georgia Power case in the 11th Circuit, and then all of these specialties. And both of these were cited by the district court, and they were cited in our papers. That there is no job site, or that a construction manager is an employer within the construction industry. This requirement that has been read into that rule, that there needs to be a specific employee of the construction manager in order for it to be a valid collective bargaining process. And then they even take it one step further, and they say that not only do they need to be a specific employee, they need to be a specific employee on the specific job. Now, I don't think that's an accurate statement of what the law is, but if you look at the facts in this case, every single job in this case that involved the carpenter doing the contested work was done by a construction manager that directly employed carpenters on that specific job. So even this expansion of the law, which doesn't exist, certainly doesn't exist in the context of this case with regard to the specific facts. And that's ultimately the problem here. There are seven jobs that they had articulated into their complaint, and then they identified as were the substance of what they said made out their antitrust case. One of those jobs never got done. That was the Bryant University job by Bond Brothers. The next job was the New London Schools job. The general contractor was Fusco. That work went to non-union labor. The next job that we're talking about, I mentioned it before, was the St. Francis Hospital job by Turner Construction, and that work was done by the Glaciers and the Ironworkers, not my clients. 360 State Street, which Suffolk Construction was the general contractor, that work was done by a contractor that was affiliated with the Glaciers and the Ironworkers. Let's step back, if I may, and consider this on a more abstract level. To avoid an antitrust violation under the non-statutory labor exemption, the subcontracting agreement has to deal with terms that are within the scope of traditionally mandatory subjects of collective bargaining. One of those is preserving work that the union traditionally does. As I understand it, the thrust of your adversary's argument is the carpenters are not preserving work. They are using these subcontracting agreements to get work that other people are doing, and that you can compete to do it, and you may very well get all those jobs, but you can't do it by a subcontracting agreement because expanding the scope of work is not preserving the scope of work. Okay, two responses to that. One, this isn't an expansion of the scope of work. As I mentioned, the precursor to this case was a series of jurisdictional arbitrations over the scope of work, and those were done through the arbitration process as to whether or not particular panel work was something that was properly within the jurisdiction. Should we look back to what the situation was in 1959? For what regard? In order to find out what work is traditionally done by the various crafts. Well, I submit, one, if you go back to what the existence was in 1959, trade unions were allowed to negotiate collective bargaining agreements with employers, and within the scope of that collective bargaining agreement, they could lay out the work that they claimed. They could enforce a subcontracting clause to make sure that that contractor, if they were going to farm out the work to somebody else, they still made sure that that work was done by carpenter labor or the union labor that was particularly relevant to whoever was signed with that employer. But the scope of the work here and the concept of plumb level and square, when you have an advance in a building technology so that, you know, building the curtain wall or the exterior, and first of all, curtain wall is not claimed by carpenters, and let's be clear about that. In this record, curtain wall has not and is not claimed by the carpenters. That has been a fallacy and a wrong claim that's in this case, and it is not in any of the collective bargaining agreements. We're talking about panel work, which is a different scope. I'm sorry, because I assume that panel work is the exterior panels of sort of prefabricated facades. Correct, and curtain wall is a different type of exterior work that is also claimed by multiple unions, and I don't profess to be an expert in all the building technologies and different exteriors of a building, but the one we're talking about here and what they claim, we're talking about panels, and panels where they used to be built where you would have steel and then you would have to attach, you know, a sheet metal worker would then attach the attachments and the glaciers would put the glass in. That was how the buildings used to be done, but building technology has changed, and so the buildings are no longer constructed that way. The exterior buildings, they're all done, and frankly, one of the plaintiffs in this case, MRS, has its own shop where they make their own panels, and they make their own panels using sheet metal workers and iron workers as part of their shop, so they're union members. Not with glass in them. What's that? Not with glass in them. No, glass is part of it, too, and that's the problem. That's where you have competing jurisdictions is that you can't just say that just because of the name of the union or what the material is that somehow falls within the scope of a particular jurisdiction. If you look at, to go back to the summary judgment record and our summary judgment brief, Steve Levesque, who was the son of Roland Levesque, Roland Levesque was MRS. Steve Levesque was his son, and he had worked there. He testified at his deposition, and he had started his own separate company, CWI, which talked about the change in building technology and why there is this competition and cross-claims by these various trades, but that doesn't mean that it's improper. It doesn't mean that it's an expansion of one particular work. You would agree that if the carpenters insisted on subcontracting agreements that gave contractors the exclusive right on a particular project to lay carpet, that that would be an expansion of the work, and that expansion of the work could not be achieved or enforced by a subcontracting agreement. I don't know that you can say that's an expansion of the work. I mean, the question is, was it part of a lawful collective bargaining process? Well, since the scope of traditional mandatory subjects of bargaining includes preserving work, then I assume that there's an opposite to that, and that is expanding work. So if the carpenters decided that they want to lay the carpet, you would agree that they would not be preserving the work. I don't know that I necessarily agree that that's an expansion of the work. Well, it wouldn't be a preserving of the work, would it? And that's all that matters. Well, no, it would be preserving. You have to be preserving the work. Otherwise, you're outside the realm of the antitrust protection. But this is why it comes back to the idea of whether or not this was part of a lawful and valid collective bargaining process. If a general contractor is in negotiations with the carpenters, and the carpenters say, you know what, we're going to do electrical wiring. I mean, that's part of a process, and the general contractor is absolutely able to say, nope, we're not going to do that. We're not going to put that in the collective bargaining agreement. No, your adversary agrees that you can bid for it, you can negotiate for it, you can do everything with respect to a building. The question is whether you can have subcontracting agreements that reserve this to your union exclusives. But I don't know that this is an ex—first of all, this is not an— there's nothing in this record to say that this particular work is an expansion of the historical work that the carpenters have done. And the key question that you need to ask yourselves, and this is what Wohlke says, and this goes back to 1959 when the construction industry proviso was passed, and then you have the non-statutory labor exemption, is the key question is, was this part of a valid collective bargaining process? And there's nothing in the record here to suggest that any of the agreements that they say are in place here was in violation of the collective bargaining process. And even if it does create a small monopoly within that particular area of the claimed work, Sunland and Local 210 say that that is the intersection that you get between labor law policy and antitrust policy, and that you always have to come down on the side of labor law policy if it is a valid collective bargaining agreement. And there's nothing in this record to suggest that there's anything other than valid collective bargaining agreements. Thank you. Thank you. Your rebuttal. With respect to the relationship between the PLAs and the CBAs, I would refer you simply to the defendant's original motion for summary judgment where the defendant specifically stated that the PLA supersedes the CBAs of any union that's a party to the PLA. So they've already acknowledged that in their motion. Moving on to the PLA, if it didn't supersede the CBAs, for example, and you had ten unions party to that PLA, every dispute involving those unions would have to be resolved by the individual collective bargaining agreement of that particular union and not the dispute resolution process of the PLA. And that would eliminate the whole purpose behind a PLA. It would simply destroy it. With respect to work preservation, the defendant has never claimed that the purpose for its subcontracting agreements was work preservation. In fact, the defendant has specifically said that work preservation is not the reason for its agreements. The defendant said that in their motion to dismiss, which is the effect of it. It doesn't matter what they're claiming. And if you have, there may be, I'm not familiar with it, but there may be a body of decisions by the arbitral panel of the AFL-CIO that in the past, before the carpenters left, would say what should be done by each craft. Am I correct? Yes, Your Honor. There's no question that if there's a body of law that says the carpenters have historically performed this work, then they can claim a valid work preservation claim here. But work preservation is an affirmative defense, which they did not raise. And secondly, they specifically said that they weren't claiming work preservation. So you can't very well claim that, hey, we've done all this work and we're trying to save it, but then say it's not work preservation. Yeah, but they are asserting that these contracts are saved from antitrust violation by the non-statutory labor exemption, and that's one piece of it. It certainly can be. It has to be subject to traditional collective bargaining, and labor preservation is one of them. That's true, Your Honor, but they've never claimed that. Yeah, but they are claiming the non-statutory labor exemption, and that gets them there. They can't claim it without doing that. No, no, and if you claim the exemption, obviously one of the requirements of the exemption is that it relate to a mandatory subject of collective bargaining. And subcontracting that's done to preserve work can be a mandatory subject of collective bargaining, but they've never claimed that in this particular case that that's the mandatory subject of collective bargaining. They've never identified any mandatory subject of collective bargaining. The closest we got to that was... They have never identified one of those subject matters. Therefore, they cannot comply with the non-statutory labor exemption. So it's really very simple. We don't have to read a lot of long briefs, right? That's correct, Your Honor, is that if they don't satisfy that element of the exemption, they lose. That's true. Yes. Okay. Thank you, Your Honor. Thank you. Thank you both. We'll reserve decision.